# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8455 | **DATE** | 2/9/2001 |
| **CASE TITLE** | Randall A. Noble vs. Michael Sheahan, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 3/6/2001 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for summary judgment [30-1] is granted in part and denied in part. Plaintiff's motion to strike [37-1] is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | FEB 1 2 2001 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 47 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FEB 1 2 2001 | |
| | | date mailed notice | |
| RO | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

FILED FOR DOCKETING
01 FEB -9 AM11: 26

RANDALL A. NOBLE,                              )
                                               )
    Plaintiff,                              )
                                               )       No. 99 C 8455
    v.                                     )
                                               )       Judge Ruben Castillo
MICHAEL SHEAHAN, in his official               )
capacity as Sheriff of Cook County, Illinois, and )
COOK COUNTY SHERIFF'S DEPARTMENT, )
                                               )
    Defendants.                             )

## MEMORANDUM OPINION AND ORDER FEB 1 2 2001

Plaintiff Randall A. Noble sues Defendants Michael Sheahan and the Cook County

Sheriff's Department for racial discrimination and retaliation under Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Noble alleges that Defendants

discriminated against him because he is African-American and retaliated against him for filing a

charge of discrimination with the Illinois Department of Human Rights ("IDHR") and the United

States Equal Employment Opportunity Commission ("EEOC"). Currently before this Court is

Defendants' motion for summary judgment. For the reasons stated below, Defendants' motion is

granted in part and denied in part.

### RELEVANT FACTS[1]

#### A. Procedural History

Plaintiff Randall Noble has been employed by the Cook County Sheriff's Department as a

---

[1] The facts are derived from statements the parties filed with this Court under Northern
District of Illinois' Local Rule 56.1. Unless otherwise indicated, the facts included herein are
undisputed.

1

deputy sheriff in the Court Services Department since July 1988. On September 7, 1995, Noble

filed a charge of discrimination with the IDHR, alleging that the Cook County Sheriff's

Department discriminated against him on the basis of race when he was "suspended for three

weeks without pay" in September 1995.[2] (R. 37-2, Pl.'s Statement of Fact ¶ 7.) Noble amended

his charge on September 28, 1995, March 21, 1996, and May 20, 1996, alleging that: (1) he had

been denied a uniform check in retaliation for having filed the original charge of discrimination;

(2) he had been subjected to unequal work conditions on February 7, 1996 when he lost two

vacation days as a result of his absences on November 20 and 22, 1995, while a white officer,

who was absent for the same reason, did not lose vacation days; (3) he had been suspended in

April 1996 in retaliation for filing the charge of discrimination; and (4) he had been

discriminated against on the basis of race in April 1996 when he was suspended for not reporting

to work on time. (*Id.* (citing R. 31, Defs.' Statement of Facts, Ex. A-D, Noble's Charges of

Discrimination).)

In March, September, and November of 1998, the Sheriff of Cook County responded to

the IDHR's requests for additional information regarding Noble's charge of discrimination. (*Id.*

at ¶¶ 15-17.) On July 16, 1999, the IDHR concluded its investigation and issued a Notice of

Substantial Evidence and Notice of Dismissal and Investigation Report. (R. 31, Defs.' Statement

---

[2] Prior to filing his charge of discrimination, Noble grieved his suspension through his union. On August 30, 1995, John Robinson, the Undersheriff, presided over the fourth-step hearing regarding Noble's grievance. (R. 37-2, Pl.'s Statement of Facts ¶ 12.) At that time, Robinson, Noble, and the union agreed to resolve the grievance by reducing Noble's twenty-nine day suspension to fifteen days. Noble subsequently requested to proceed to step five of the grievance process, arbitration, which Robinson declined because "Noble and the union had signed off on the resolution of the grievance, [therefore] the result of the fourth-step hearing was binding on Noble." (R. 46, Defs.' Resp. to Pl.'s Statement of Facts ¶ 12.)

of Facts ¶ 13, Ex. M, July 16, 1999 IDHR Notice of Substantial Evidence and Notice of Dismissal.) The IDHR concluded that there was "substantial evidence" to support Noble's allegation that he was discriminated against on the basis of his race when the Sheriff's Department denied him a uniform allowance. (*Id.*) The IDHR, however, found a lack of substantial evidence to support Noble's other allegations. (*Id.*) On September 16, 1999, the IDHR filed a complaint on behalf of Noble with the Human Rights Commission. (*Id.* at ¶ 16.)

On August 13, 1999, two days after Noble was informed that Defendants had suspended him without pay pending Merit Board action for allegedly violating various general orders of the Cook County Sheriff's Department, Noble filed a second charge of discrimination alleging that Defendants discriminated and retaliated against him on the basis of race for filing his September 1995 charge of discrimination and for participating in the investigation of that charge. (*Id.* at ¶¶ 4, 14-15.) The EEOC issued a Notice of Right to Sue with regard to Noble's August 13, 1999 charge of discrimination, and Noble filed the instant lawsuit. (*Id.* at ¶ 17.)

**B. Noble's Alleged Misconduct**

Defendants allege that, beginning in 1998, Noble violated various general orders of the Cook County Sheriff's Department. (*Id.* at ¶ 4.) In early to mid 1998, Noble applied for a part-time security position at Club Paradise, a nightclub/restaurant that Charles Miceli claimed he was opening in September 1998. (R. 37-2, Pl.'s Statement of Facts ¶¶ 22, 23.) Noble contends that he was not hired for this position and that he "never worked for Miceli in any capacity." (*Id.* at ¶ 23 (citing July 12, 2000 Noble Dep. at 64-65).) Defendants respond that, despite not being hired for the nightclub/restaurant, Noble subsequently worked for Miceli as a bodyguard. (R. 46, Defs.' Resp. to Pl.'s Statement of Facts ¶ 23 (citing Lambert Dep. at 58-59).)

In July 1998, Miceli traveled to Florida purportedly to check on his children who had been injured when someone threw a brick through the window of his ex-wife's house in Florida. (R. 37-2, Pl.'s Statement of Facts ¶ 26.) Miceli claimed that his ex-business partner, Marvin Cruz, was responsible for the incident. (*Id.*) Noble and Michael Mostacci, who was employed as Miceli's Director of Operations for Club Paradise, went to Florida at the same time, though Noble denies that he went as an employee of Miceli. (*Id.* at ¶¶ 24-26.) According to Noble, he "agreed to go on the trip to Florida because he was under stress at work and needed to get away." (*Id.* at ¶ 26 (citing Dec. 17, 1998 Noble Dep. at 378).)

Later that month, Miceli claimed that his father had been murdered in New York, and asked Mostacci to go to New York with him to make arrangements to retrieve the body. Noble, along with several other deputy sheriffs who were allegedly employed by Miceli, also went to New York. (*Id.* at ¶ 27.) On their return, Miceli asked Mostacci to pay for the airline tickets, which he did using his American Express card. (*Id.*) According to Mostacci, Miceli kept the receipts for the purpose of later reimbursing Mostacci. (*Id.*) Instead, according to Mostacci, Miceli obtained an additional card on Mostacci's account, without his authorization, and charged over $31,000. (*Id.*) Defendants contend that Mostacci authorized Miceli to use his credit card, and that the written authorization was witnessed by Noble. (R. 46, Defs.' Resp. to Pl.'s Statement of Facts ¶ 28 (citing July 19, 1998 Noble Dep. Ex. 1).) In August 1998, Mostacci filed a complaint against Miceli for credit card fraud. (*Id.*) Detective David Lambert of the Cook County Sheriff's Department took Mostacci's statement, and began an investigation into the alleged fraud by Miceli. (R. 37-2, Pl.'s Statement of Facts ¶¶ 28-29.) The scope of Lambert's investigation ultimately expanded to include allegations that Miceli issued and deposited back

4

checks and stole money from Mostacci's mother. (*Id.* at ¶ 29.)

## B. Investigations into Noble's Alleged Misconduct

### (i) Investigation No. 98-08-001

On August 2, 1998, Sergeant Walter Hackl and Investigator Luke Ballo of the Cook

County Sheriff's Department met with Miceli, who informed them that he was "seeking internal

affairs protection because there was a plot to kill him." (*Id.* at ¶ 33.) At that time, Miceli also

told Hackl and Ballo of a plot to have Cruz "hit," and explained that several deputy sheriffs,

including Noble, were involved in this alleged plot. (*Id.*) Based on Miceli's allegations, Hackl

commenced an investigation. (R. 31, Defs.' Statement of Facts ¶ 19.)[3] Miceli purportedly told

Hackl that: (1) Noble had been employed by Miceli to work as a bodyguard and was now

threatening to kill him; (2) Noble had acted as Miceli's bodyguard on trips to Florida and New

York in July 1998; (3) Noble had represented to the airlines that he was flying on official

business so that he could carry a firearm on the plane; and (4) Noble had provided Miceli with

Marvin Cruz's criminal history sheet and written a note to Miceli offering to eliminate Cruz for

$20,000. (*Id.* at ¶ 19.) Noble denies that he engaged in any such conduct, (R. 37-1, Pl.'s Resp. to

Defs.' Statement of Facts ¶ 19), but does not deny that Miceli made these statements to Hackl or

---

[3] Noble moved to strike paragraphs 4, 19, 20, 21, 22, 23, 24, 25 and 26 of Defendants' Statement of Material Facts as unsupported by admissible evidence. Specifically, Noble claims that the evidence relied upon by Defendants, namely Investigator Thomas Swaine's investigation reports, is inadmissible hearsay. Defendants respond that this evidence is not hearsay because it is not being offered for its truth, but rather to "explain Swaine's mental state at the time that he, first, recommended that plaintiff be suspended for twenty-nine days and, second, recommended that plaintiff be terminated." (R. 44, Defs.' Resp. to Pl.'s Mot. to Strike at 1-2.) We agree that, when used for this purpose, the statements contained in Swaine's report are not hearsay. Accordingly, we deny Noble's motion to strike paragraphs 4, 19, 20, 21, 22, 23, 24, 25 and 26 of Defendants' Statement of Material Facts.

that Hackl relayed these statements to Swaine. (R. 45, Defs.' Reply in Supp. of Defs.' Statement of Facts ¶ 19.)

The Office of the Inspector General of the Cook County Sheriff's Department assigned Thomas Swaine to investigate these allegations. (R. 31, Defs.' Statement of Facts ¶ 19.) The steps Swaine took in conducting investigation No. 98-08-001 included: (1) obtaining documents from airlines and hotels in an effort to confirm that Miceli and Noble traveled together and that Noble carried a firearm; (2) interviewing Detective Lambert, who was investigating Miceli for theft, regarding conversations he had with Noble and other witnesses; (3) interviewing Noble and the other deputy sheriffs under investigation; (4) interviewing Marvin Cruz; (5) obtaining Noble's time sheets which revealed that he took vacation days on the dates of the trips reported by Miceli; (6) obtaining copies of Cruz's criminal history sheet; (7) attempting to obtain originals of the documents described above; and (8) submitting the documents to a handwriting analyst. (*Id.* at ¶ 20.) In October 1998, at the conclusion of this investigation, Swaine sustained six allegations against Noble, including that: (1) Noble engaged in unauthorized secondary employment; (2) Noble provided personal protection without a license; (3) Noble carried a firearm on an aircraft without authorization; and (4) Noble abused sick time. (*Id.* at ¶ 21.) Swaine recommended a twenty-nine day suspension. (*Id.*, Ex. Q, October 6, 1998 Summary Report of Complaint Investigation 98-08-001 at 33.)

Noble does not dispute that Swaine sustained six allegations of misconduct against him in October 1998. However, Noble does dispute the truth of Swaine's findings. (R. 37-1, Pl.'s Resp. to Defs.' Statement of Facts ¶ 21.) Moreover, Noble disputes that Swaine genuinely believed them to be true. (*Id.*) As part of Swaine's investigation, he took a statement from

Noble in September 1998 in which Noble specifically denied "point by point each and every allegation of misconduct." (*Id.*) Noble denied the allegations that: (1) he had provided armed protection, without authorization, for Miceli; (2) he had failed to report for duty without justification; (3) he had provided armed protection for Miceli on a commercial airline during trips to Florida and New York; (4) he had illegally obtained Cruz's criminal history sheet; (5) he had offered to eliminate Cruz; and (6) he had threatened to kill Miceli. (R. 37-2, Pl.'s Statement of Facts ¶ 58.)

Noble points to additional evidence to call into question the genuineness of Swaine's findings. Swaine's report is based, in part, on statements made by Miceli. Noble points out that Swaine obtained Miceli's criminal history report, which included arrests and convictions for crimes including eavesdropping and forgery, and which indicated Miceli was currently on parole. (*Id.* at ¶ 42.) Swaine was also aware that Miceli was under investigation by authorities in Florida, and that Miceli had been arrested and briefly returned to prison for violating his parole in August 1998. (*Id.* at ¶¶ 42-43). Swaine admitted that Miceli was a "nefarious gentleman" and that many people told him Miceli was "untrustworthy." (*Id.* ¶¶ 45, 50). Swaine testified that, at least according to Mostacci, Noble was not involved in the plan to kill Cruz. (*Id.* at ¶ 54.)

Finally, Noble points to evidence that, in September 1998, Swaine spoke with Mostacci by phone and informed him that he was investigating Noble and other deputy sheriffs. (*Id.* at ¶ 59.) Swaine indicated that he knew Mostacci had seen them carrying their firearms on the plane with Miceli and providing armed security for Miceli outside of Illinois. (*Id.* at ¶ 59.) Mostacci informed Swaine that he did not see Noble carrying a firearm on the plane or at any time during their trips. (*Id.*) In the ensuing weeks, Swaine contacted Mostacci several times,

insisting that Mostacci had seen Noble with a weapon and demanding that he provide a statement to this affect. (*Id.* at ¶ 60.) Swaine told Mostacci that "he could be criminally prosecuted for 'withholding evidence' if he did not tell him 'the truth.'" (*Id.*)

(ii) *Investigation No. 98-11-033*

On November 5, 1998, a month after Swaine closed investigation No. 98-08-001, Swaine allegedly received additional information regarding Noble, which prompted him to open a second investigation, No. 98-11-033. (R. 31, Defs.' Statement of Facts ¶ 25.) Also in November 1998, Mostacci was arrested and put in jail. (R. 37-2, Pl.'s Statement of Facts ¶ 62.) On December 8, 1998, while incarcerated, Mostacci had a conversation with Defendant Michael Sheahan, the Sheriff of Cook County. (*Id.* at ¶ 63.) Mostacci told Sheahan that Miceli had made direct threats of physical harm against him and others, including Noble. (*Id.*) Mostacci also told Sheahan that when he spoke to Swaine, Swaine became aggravated because Mostacci did not tell him what he wanted to hear. (*Id.*) Sheahan mentioned the civil suit that Noble had brought against him, and indicated that he knew Mostacci could provide information regarding Noble. (*Id.*) According to Mostacci, during this meeting, Sheahan asked him why he was covering up for Noble, a "fucking nigger." (*Id.*)

On December 18, Swaine notified Noble that Defendants intended to pursue additional disciplinary action against him. (*Id.* at ¶ 65.) On December 28, Noble gave a second statement to Swaine, denying the additional charges which included allegations that: (1) he had obtained Cruz's criminal history sheet without legal authorization and delivered it to Miceli; (2) he had written a note that purportedly outlined a plan to falsely arrest Cruz or "eliminate" him and given

8

that note to Miceli;[4] (3) he had hired someone to break a window in Cruz's residence; and (4) he

had provided false information in his first statement to Swaine. (*Id.* at ¶ 65.)

**D. Noble's Current Employment Status**

On March 8, 1999, Swaine completed investigation No. 98-11-033 and issued a Summary

Report, wherein he sustained several of the allegations against Noble and recommended that

Noble be terminated. (R. 31, Defs.' Statement of Facts ¶ 26.) Noble denies these allegations and

further disputes that Swaine genuinely believed them to be true. (R. 37-1, Pl.'s Resp. to Defs.'

Statement of Facts ¶ 26.) On April 19, Noble injured his back while at work and was placed on

injured duty status. (R. 37-2, Pl.'s Statement of Facts ¶¶ 72-74.) On April 22, Defendants

maintain that a Loudermill Hearing Board sustained the allegations against Noble. (R. 46, Defs.'

Resp. to Pl.'s Statement of Facts ¶ 79.) Noble, however, disputes that he received a Loudermill

Hearing. (R. 37-2, Pl.'s Statement of Facts ¶¶ 75-79.) On May 3, Undersheriff Robinson

approved Noble's suspension without pay pending Merit Board action.[5] (R. 31, Defs.' Statement

of Facts ¶ 11.) Robinson also signed a complaint alleging various acts of misconduct by Noble,

---

[4] Noble disputes that the document referenced in subsection 6 of paragraph 20 of Defendants' Statement of Facts as "the note wherein an offer to eliminate Cruz is made" contains any reference to Marvin Cruz. (R. 37-1, Pl.'s Resp. to Defs.' Statement of Facts ¶ 20.) We agree, and therefore do not rely upon such evidence in rendering a decision with respect to Defendants' Motion for Summary Judgment.

[5] Noble moved to strike paragraph 11 of Defendants' Statement of Material Facts as unsupported by admissible evidence. Specifically, Noble claims that the evidence relied upon by Defendants, namely Robinson's written approval of the suspension recommendation, is inadmissible hearsay. Defendants respond that this document is not hearsay because Robinson can testify that he approved the recommendation. Defendants also contend that this evidence is admissible as an exception to the hearsay rule under Rules 803(6) and 803(8)(A) of the Federal Rules of Evidence. (R. 44, Defs.' Resp. to Pl.'s Mot. to Strike at 1-2.) We agree that the document is admissible as an exception to the hearsay rule. Accordingly, we deny Noble's motion to strike paragraph 11 of Defendants' Statement of Material Facts.

and the complaint was filed before the Merit Board. (*Id.* at ¶ 12.) On August 11, Noble returned to work from his injury and reported to the personnel office, where he was informed that he had been suspended without pay pending Merit Board action. (R. 37-2, Pl.'s Statement of Facts ¶ 78.) The matter is still pending before the Merit Board and Noble currently remains suspended without pay.

Noble filed the instant lawsuit, alleging that his August 1999 suspension was discriminatory and retaliatory in violation of Title VII. Defendants moved for summary judgment on the following grounds: (1) Noble has not established discrimination or retaliation based on direct evidence; (2) Noble has not established a prima facie case of race discrimination under the indirect burden-shifting method in that he has not established that he was meeting his employer's legitimate expectations, and he has not established that similarly situated non-minority employees were treated more favorably; (3) even if Noble could establish a prima facie case of discrimination, Defendants are nonetheless entitled to summary judgment because they had a legitimate, non-discriminatory reason for the employment actions they took; and (4) Noble has not established a prima facie case of retaliation in that he has not established a causal link between his statutorily protected expression and Defendants' adverse employment action.

## LEGAL STANDARDS

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court must view all evidence

in the light most favorable to the non-moving party and draw all inferences in the non-movant's

favor. *See Wolf v. Buss America, Inc.*, 77 F.3d 914, 918 (7th Cir. 1996). However, neither "the

mere existence of some alleged factual dispute between the parties," *Liberty Lobby*, 477 U.S. at

247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), is sufficient to defeat a motion for

summary judgment. In ruling on a motion for summary judgment, we must ascertain whether

sufficient evidence exists to support a verdict in the non-movant's favor; weighing evidence and

drawing reasonable inferences are jury functions, not those of the judge deciding a motion for

summary judgment. *Id.* at 255. We must apply summary judgment standards with added rigor in

employment discrimination cases, where issues of intent and credibility often dominate.

*Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994).

## ANALYSIS

### A. Discrimination and Retaliation -- Direct Evidence

Noble can avoid summary judgment on his Title VII discrimination and retaliation claims

either by offering direct evidence of Defendants' discrimination or by the indirect burden-shifting

method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Helland v. South Bend*

*Cmty. Sch. Corp.*, 93 F.3d 327, 329 (7th Cir. 1996). Direct evidence is "evidence which if

believed by the trier of fact will prove the particular fact in question without reliance on inference

or presumption." *Cowan v. Glenbrook Sec. Serv. Inc.*, 123 F.3d 438, 443 (7th Cir. 1997)

(citation omitted). To establish discrimination and retaliation by the direct method, Noble must

produce evidence that the trier of fact can interpret as an acknowledgment of Defendants'

discriminatory and retaliatory intent. *See Hill v. Burrell Communications Group, Inc.*, 67 F.3d

665, 667 (7th Cir. 1995). Allegedly discriminatory statements proffered by Noble as direct evidence are relevant "only if they are both made by a decisionmaker and related to the employment decision at hand." *Stropka v. Alliance of Am. Insurers*, 141 F.3d 681, 688 (7th Cir. 1998). Statements by a nondecisionmaker "normally cannot provide the basis for a determination of discrimination." *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998). Furthermore, for isolated comments or stray remarks to rise to the level of direct evidence of discrimination or retaliation, the statements "must be contemporaneous with the [adverse action] or causally related to the [applicable] decision making process." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998) (quoting *Geier v. Medtronic Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)).

Noble cites, as direct evidence of discriminatory and retaliatory motive for his suspension without pay in May 1999, Defendant Sheahan's use of a derogatory racial term to describe Noble when Sheahan visited Michael Mostacci at Cook County Jail in December 1998. (R. 37-1, Pl.'s Statement of Facts ¶ 63.) According to Noble, Sheahan was attempting to obtain information related directly to Swaine's investigation, which was the basis for the decision to suspend Noble and initiate Merit Board proceedings against him. (*Id.* at ¶ 63.) Noble argues that Sheahan must have influence this decision because the general orders of the Court Services Department require that "[t]he Sheriff must review and approve any decision to file a complaint with the Merit Board seeking the discharge of a deputy sheriff." (*Id.* at ¶¶ 11, 86.)

Addressing each of these matters in turn, we find no direct evidence of discriminatory or retaliatory intent on the part of Defendants. Defendant Sheahan's allegedly racial statement to Mostacci, a third party, almost five months before Robinson approved the recommendation that

Noble be suspended without pay pending Merit Board action is a stray remark unrelated to that recommendation, and the isolated comment is not contemporaneous with the adverse action. *See Kennedy*, 140 F.3d at 722.

Moreover, Plaintiff produces no evidence that Sheahan was a "decisionmaker" in the adverse action. There is no indication that any individuals in the command channel review, from Swaine, who conducted the investigations against Noble, to Robinson, who approved Noble's suspension and signed the complaint before the Merit Board, had any communication with Sheahan regarding Noble. (R. 31, Defs.' Statement of Facts ¶¶ 11, 12, 18, 27.) Plaintiff's argument that Sheahan "must review and approve any decision to file a complaint with the Merit Board seeking the discharge of a deputy sheriff," and that "even if Sheahan did not personally sign [the suspension and complaint] . . . a jury could nevertheless reasonably infer that Sheahan influenced those decisions," is not supported by the evidence. (R. 37-3, Plaintiff's Opp'n to Defs.' Mot. for Summ. J. at 11.)

In fact, the evidence indicates that Sheahan was not the decisionmaker in this case. (R. 46, Defs.' Resp. to Pl.'s Statement of Fact ¶ 86 (citing Ex. G, Investigation No. 98-11-033 Command Channel Review Form).) Sheahan did not testify, as Noble maintains, that he must review and approve every Merit Board complaint seeking termination. (*Id.*) Robinson testified that he has acted in Sheahan's stead many times with respect to disciplinary actions. (*Id.* at ¶ 11.) Moreover, despite Noble's reliance on the testimony of Ray Zene, an investigator from the Internal Affairs Department, to establish that Sheahan was the decisionmaker, we agree with Defendants that Zene testified only as to the review procedures of the Internal Affairs Department as he specifically stated that he did not know the procedures of the Inspector

General's Office (the office that conducted the Noble investigations). (*Id.*) Because Noble has failed to establish direct evidence of discrimination and retaliation under Title VII, summary judgment for Defendants is appropriate with respect to this aspect of Noble's claims.

## B. Discrimination -- Indirect Burden-Shifting Method

When, as in this case, there is no direct evidence of discrimination, Noble may meet his burden of proving employment discrimination through the indirect burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1000-01 (7th Cir. 2000). Under the *McDonnell Douglas* burden-shifting method, Noble must raise an inference of discrimination by offering sufficient evidence to make out a prima facie case against Defendants. *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). To make out a prima facie case of discrimination, Noble must establish that: (1) he belongs to a protected class; (2) he was meeting Defendants' legitimate expectations; (3) he suffered an adverse employment action; and (4) he has evidence from which the Court can infer that the adverse action sprang from a "legally forbidden ground," such as more favorable treatment of similarly-situated, non-minority employees. *See Stockett*, 221 F.3d at 1000-01; *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158-59 (7th Cir. 1996).

If Noble succeeds in making out a prima facie case, a rebuttable presumption of discrimination arises and the burden of production shifts to Defendants to articulate a legitimate, non-discriminatory explanation for suspending Noble without pay pending Merit Board action. *See Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742 (7th Cir. 1999). At this stage, Defendants need not prove that they were actually motivated by their proffered reason. Rather, Defendants "need only produce admissible evidence which would allow the trier of fact rationally to

conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981).

If Defendants can produce a legitimate, non-discriminatory explanation, the presumption of discrimination dissolves and the burden of production shifts back to Noble to demonstrate that the proffered reason is a pretext for discrimination. *Id.* at 254. Noble can establish pretext by showing either that: (1) discriminatory intent more likely than not motivated Defendants; or (2) Defendants' proffered explanation is "unworthy of credence" because the explanation has no basis in fact, is not the real reason for the adverse action, or is insufficient to justify any adverse action. *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 303-04 (7th Cir. 1996); *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir. 1995). Finally, we note that, although the *McDonnell Douglas* approach is often called a "burden-shifting" method of proof, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Defendants offer two alternate grounds in support of their motion for summary judgment on the discrimination claim. First, Defendants argue that Noble cannot satisfy the second and forth prongs of his prima facie case. Defendants contend that Noble did not meet their legitimate expectations and that Noble has not pointed to any similarly situated non-minority employees who were treated more favorably. Second, Defendants argue that even if Noble has established a prima facie case of discrimination, he has not provided evidence that Defendants' proffered reason for suspending Noble without pay pending Merit Board action was a pretext for discrimination. We disagree and, therefore, deny Defendants' motion for summary judgment on the discrimination claim.

*(i) Noble Was Meeting Defendants' Legitimate Expectations*

Defendants contend that Noble cannot establish a prima facie case of discrimination because he did not satisfy Defendants' legitimate expectations. As evidence, Defendants direct this Court to Noble's fifteen day suspension in February 1995 for conduct unbecoming an officer. In addition, Defendants cite Noble's twenty-nine day suspension in 1998 and his current suspension without pay pending Merit Board action for alleged acts of misconduct. Finally, Defendants argue that Noble has provided no documentary or testimonial evidence from coworkers or supervisors of satisfactory job performance evaluations. In response, Noble categorically denies each allegation of misconduct against him. (R. 37-1, Pl.'s Statement of Facts ¶¶ 58, 65.) Furthermore, Noble submits an affidavit stating that he consistently performed his job in accordance with Defendants' general orders and all other applicable established policies and procedures, and also noting specific instances in which he exceeded the normal requirements of his job. (*Id.* at ¶ 100 (citing October 24, 2000 Noble Aff. at ¶¶ 2-3).)

We find that Noble presents sufficient evidence to create a genuine issue of material fact as to whether he satisfied Defendants' legitimate expectations. As a preliminary matter, Noble's 1995 suspension, four years before his current suspension, is of limited relevance because "the critical issue is whether [the employee] was performing well in [his] job at the time of [his] termination." *Hong Kong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993). Moreover, Noble's current suspension and his suspension in 1998 are based upon disputed facts, intent and credibility, leaving us with what is "essentially a swearing contest." *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 358 (7th Cir. 1996). As a result, this case is distinguishable from *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833 (7th Cir. 1996), cited by Defendants,

16

where "the record contains scant evidence (if any) to support the plaintiff's contention that she was performing her job at First Federal's satisfaction . . . [and] abundant evidence that [the plaintiff] was falling short of her employer's legitimate expectations." *Id.* at 843. Nor is this case similar to *Fortier v. Ameritech Communications, Inc.*, 161 F.3d 1106 (7th Cir. 1998), also cited by Defendants, where the employer conducted a formal annual performance review, gave the employee the lowest rating possible and fired him despite his denials of deficient performance. *Id.* at 1113-14.

In this case, there is an absence of any specific evidence by Defendants that Noble was not meeting their legitimate expectations, other than the disputed allegations of off-duty misconduct they claim led to Noble's suspension and the pending Merit Board complaint. For example, Defendants have provided no evidence of negative performance reviews, no testimonials from coworkers or supervisors and no other documentary evidence that Noble was falling short of their expectations. Noble's affidavit and categorical denial of Defendants' disputed allegations, on the other hand, constitute affirmative evidence that he met his employer's legitimate expectations. *See Wohl*, 94 F.3d at 358; *Courtney*, 42 F.3d at 418; *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 923 n.6 (7th Cir. 1988); *Conrad v. P.T.O. Servs., Inc.*, 1996 WL 169404, *4 (N.D. Ill. April 9, 1996). Given the unusual circumstances of this case in which Defendants utterly fail to provide any undisputed or preexisting evidence that Noble was not meeting their legitimate expectations, and in light of the applicable standard we must apply, we conclude that Noble has satisfied the second prong of his prima facie discrimination case, and we now consider the fourth prong of this claim.

*(ii) Similarly Situated Non-Minority Employees Were Treated More Favorably*

In determining whether two employees are similarly situated, a court must look at all relevant factors, which are based on the context of the case. *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). In cases where the plaintiff claims that he was disciplined by his employer more harshly than similarly situated non-minority employees based on some prohibited reason, the plaintiff "must show that he is similarly situated with respect to performance, qualifications, and conduct" and that he and the other employees "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000); *see also Mora v. Chicago Tribune*, 57 F. Supp. 2d 626, 635 (N.D. Ill. 1999).

As noted above, Defendants allege that Noble committed the following acts of misconduct: (1) engaging in unauthorized secondary employment; (2) providing personal protection without a license; (3) carrying a firearm on an aircraft without authorization; (4) abuse of sick time; (5) using his position as a deputy sheriff to obtain, and distribute without authorization, a confidential criminal history report; (6) threatening to kill one individual and offering to frame and/or arrange for the murder of another individual; and (7) making wilful misrepresentations, signing false statements and giving false testimony during an internal investigation. (R. 31, Defs.' Statement of Facts ¶¶ 21-26.) Following an internal investigation of Noble's conduct, a complaint was filed against Noble before the Merit Board and Noble was suspended without pay pending Merit Board action. (*Id.* at ¶¶ 11-12, 26.)

Noble identifies eight non-minority peace officers of the Cook County Sheriff's

Department as similarly situated employees whom he argues were treated more favorably than him in disciplinary cases: Thomas Lanigan, Anthony Bohling, Andrew Remus, Daniel Troike, Thomas Seabloom, Richard Lovejoy, Clyde Blair and Agapito Anzaludua. Defendants argue that none of these officers is similarly situated to Noble for a variety of reasons. We address each of these officer's situations individually and find that Noble has presented a genuine issue of material fact for trial such that a reasonable jury could find that similarly situated non-minority employees were treated more favorably than him.

First, we reject Defendants' attempt to distinguish Noble from Lanigan, Bohling, Remus, Troike, Seabloom and Lovejoy on the basis that Noble is a deputy sheriff and they are either police officers or correctional officers. Defendants' argument that the Cook County Sheriff's Department is divided into three main divisions, that each division has its own chain of command and that each division has its own duties and responsibilities is not persuasive. (R. 43, Defs.' Reply at 8-9.) The focus of our analysis is on the similar nature of the employee misconduct rather than on specific company disciplinary rules or command structures. *Johnson v. Artim Transp. Sys., Inc.* 826 F.2d 538, 542 (7th Cir. 1987). We find that a reasonable jury could infer from the evidence that all deputy sheriffs, regardless of the department in which they work, are considered police officers under Illinois law, are subject to the same chain of command under the auspices of the Inspector General's office for purposes of reviewing and approving disciplinary actions and are subject to the same rules and regulations of the Merit Board relating to disciplinary measures and conduct of employees. (R. 37-2, Pl.'s Statement of Facts ¶ 86.)

Noble argues that Lanigan, Bohling, Remus and Troike, all non-minority police officers in the Cook County Sheriff's Department, engaged in acts of misconduct similar to those alleged

against him but were treated more favorably. On June 2, 1999, Lanigan was in a car with Bohling, Remus and Troike and allegedly fired his gun at the occupants of another vehicle. (R. 37-2, Pl.'s Statement of Facts ¶ 89.) The physical evidence gathered that night established that Lanigan misused his weapon when he fired it. (*Id.* at ¶ 90.) On June 4, the Sheriff's Department issued written orders to the officers not to carry their firearms, but the order expressly stated that their status as police officers, salary, benefits and job rights would not in any way be diminished or affected. (*Id.* at ¶ 91.) On October 1, Lanigan and Bohling, who was driving the car, were charged with attempted first-degree murder, aggravated discharge of a firearm, official misconduct and obstruction of justice. (*Id.*) Remus and Troike were charged with official misconduct and obstruction of justice, including allegations that they falsely informed law enforcement authorities that no shots were fired from their vehicle. (*Id.*) On October 14 and 15, Lanigan was suspended without pay by Sheriff Sheahan and a complaint was filed with the Merit Board seeking his discharge. (*Id.* at ¶ 93.) Bohling, Remus and Troike, however, continue to work in administrative positions and no Merit Board proceedings have been initiated against them. (*Id.*) Defendants maintain that Lanigan was not treated differently than Noble because, like Noble, he was suspended without pay pending Merit Board action. (R. 43, Defs.' Reply at 10.) Defendants also contend that there was insufficient evidence to determine that Bohling, Remus and Troike had engaged in misconduct and that a criminal investigation takes precedence over an internal investigation by the Sheriff's Department. (*Id.* at 11.) While we agree with Defendants that "the mere placement of criminal charges is not evidence of misconduct," (R. 43, Defs.' Reply at 13), we are troubled by the varying degrees of employee misconduct and the divergent treatment afforded them by the Cook County Sheriff's Department. That these non-

minority peace officers, who are facing multiple criminal charges, continue to be employed and paid by Defendants, while Noble, who is accused of lesser misconduct in this Court's opinion, is suspended without pay, raises genuine issues of dissimilar treatment.

Noble also names Thomas Seabloom and Richard Lovejoy, two non-minority correctional officers in the Cook County Sheriff's Department, as employees who committed similar acts of misconduct and whom Sheriff Sheahan allowed to work pending Merit Board action. (R. 37-2, Pl.'s Statement of Facts ¶ 97, 99.) Seabloom failed to intervene in an inmate beating and filed false reports relevant to the incident. (*Id.* at ¶ 97.) Lovejoy improperly used his badge to secure personal information and made threatening, racially charged phone calls to his estranged wife and her boyfriend. (*Id.* at ¶ 99.) Defendants' argument that neither Seabloom nor Lovejoy, individually, committed all of the violations that Noble, on his own, committed, is unconvincing. (R. 43, Defs.' Reply at 13.) Seabloom and Lovejoy are similarly situated employees who "engaged in similar conduct" and were treated more favorably than Noble. *See Radue*, 219 F.3d at 617-18.

Clyde Blair, like Noble a Court Services deputy sheriff, was arrested and charged with forgery on October 13, 1998. (R. 46, Defs.' Resp. to Pl.'s Statement of Facts ¶ 85.) While the criminal investigation remained open for more than eighteen months, no Merit Board proceedings were initiated against Blair and he remained on payroll reassigned to a clerical position. (*Id.*) Finally, on June 27, 2000, after a determination that the criminal case was unlikely to be resolved in the near future, Blair was suspended without pay pending Merit Board action. (*Id.*) Even accepting the argument that the Sheriff's Department generally refrains from initiating Merit Board proceedings against employees who are the subject of a criminal

investigation, we find it problematic that no Merit Board proceedings were initiated against Blair and that he remained on payroll for eighteen months despite criminal charges against him, while Noble was suspended without pay pending Merit Board action after less than six months of internal investigation. (*Id.* (citing Ex. 23, Flaherty Aff. at 1-2).) Viewing this evidence in the light most favorable to Noble, we believe that a reasonable jury could infer that Noble was treated more harshly than Clyde Blair, a similarly situated non-minority Court Services deputy sheriff, who it can be argued committed more serious acts of misconduct than those alleged to have been committed by Noble.

Agapito Anzaludua, another non-minority Court Services deputy sheriff, was suspended for fifteen days for using unreasonable force against a prisoner under his control. (R. 37-2, Pl.'s Statement of Additional Facts ¶ 98.) Defendants argue that this is the identical punishment to the suspension that Noble received in 1995 following a domestic dispute. (R. 43, Defs.' Reply at 12.) We disagree and note several differences, including that: (1) Anzaludua's misconduct was the second allegation against him in the same month (R. 37-3, Pl.'s Resp., Ex. 42, June 22, 1999 Non-Concurrence with Recommendation for Disciplinary Action Against Anzaludua); (2) Anzaludua's original recommended discipline was five days but in a non-concurrence memorandum Inspector General Shaughnessy recommended that Anzaludua be suspended for fifteen days (*id.*); and (3) Noble's original suspension was twenty-nine days but was reduced to fifteen days after a fourth-step grievance hearing. (R. 37-2, Pl.'s Statement of Additional Facts ¶ 12.) We find that, despite engaging in similar conduct without differentiating circumstances, there are genuine issues of material fact as to whether Defendants treated Anzaludua more favorably than Noble. Therefore, because Noble has provided sufficient evidence for a

reasonable jury to find that similarly situated non-minority employees were treated more favorably than him, we conclude that Noble has made out a prima facie case of discrimination and we turn now to the issue of pretext.

*(iii) Pretext*

Under *McDonnell Douglas*, the burden now shifts to Defendants to state a legitimate, non-discriminatory reason for suspending Noble without pay pending Merit Board action. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999). Defendants claim they suspended Noble not because of his race, but because of Swaine's investigations into alleged violations of general orders of the Sheriff's Department by Noble and the subsequent review and approval of Swaine's termination recommendation by the Loudermill Board. (R. 30, Defs.' Mot. for Summ. J. at 14.) If Defendants genuinely believe that Noble committed these acts of misconduct, then that would be a legitimate, non-discriminatory reason for suspending him.

Thus, because Defendants have satisfied their burden of producing a legitimate, non-discriminatory reason for suspending Noble, under the *McDonnell Douglas* framework, the burden now shifts back to Noble to show that Defendants' proffered reason is pretextual. *Johnson*, 170 F.3d at 742. Noble may show pretext by producing evidence that Defendants' ostensible justification is unworthy of credence. *See Testerman*, 98 F.3d at 303.

> [A] plaintiff may accomplish this showing with evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge. There formulations are simply different ways of recognizing that when the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation.

*Id.* (internal citations omitted). The plaintiff need only "produce evidence from which a rational

factfinder could infer that the [defendant] lied about its proffered reasons . . . ." *Weisbrot v. Med. Coll. of Wis.*, 79 F.3d 677, 682 (7th Cir. 1996).

This Court looks not at the wisdom of the employer's decision, but rather at the genuineness of the employer's motives. *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) (a court does "not sit as a super-personnel department that reexamines an entity's business decisions"). Nevertheless, the summary judgment standard should be applied with added rigor in employment discrimination cases because intent and credibility are crucial issues. *Courtney*, 42 F.3d at 418. Hence, evidence that calls Defendants' truthfulness into question clearly precludes summary judgment. *Conrad*, 1996 WL 169404 at *5; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2109 (2000) (observing that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of face to conclude that the employer unlawfully discriminated").

As evidence of pretext, Noble maintains that: (1) he categorically denied each of the allegations against him; (2) similarly situated non-minority employees were treated more favorably than him; (3) Miceli, Defendants' chief witness in Swaine's investigations, was untrustworthy and "nefarious," and Swaine could not genuinely have believed Miceli and the proffered reasons for the termination recommendation; and (4) an alleged racial statement by Sheahan shows that Defendants' real motivations were illegal discrimination and retaliation. (R. 37-3, Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 18-21.) The first three pieces of evidence raise genuine issues for trial regarding whether Defendants' reason for suspending Noble without pay

pending Merit Board action is a pretext for the true motivation for his suspension.[6]

We agree with Defendants that Noble's categorical denial of each of Defendants' allegations against him does not alone create a factual issue on summary judgment. (R. 43, Defs.' Reply at 14.) However, Noble's statements to Swaine in which he specifically refuted facts that allegedly support Defendants' proffered reason for suspending him, (R. 37-1, Pl.'s Resp. to Defs.' Statement of Facts ¶ 4 (citing Noble Dep. Ex. 4 and 5, Statements to Swaine).), when viewed with the evidence in its totality, does succeed in casting doubt on Defendants' explanation. *See Hubbard*, 1 F. Supp. 2d at 862 (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) (noting that "a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claims of performance deficiencies")). That said, we turn to our analysis of Noble's additional evidence of pretext.

As stated above, Noble has provided sufficient evidence for a reasonable jury to find that similarly situated non-minority employees of the Cook County Sheriff's Department, including Bohling, Remus, Troike, Seabloom, Lovejoy, Blair and Anzaludua were treated more favorably than Noble despite arguably being accused of committing more serious acts of misconduct. This evidence is relevant to proving pretext because it further suggests that Defendants' explanation is unworthy of credence. *See Stalter*, 195 F.3d at 290-91.

---

[6] We earlier found that Sheahan's allegedly racial statement to Mostacci, a third party, almost five months before Robinson signed the Merit Board complaint against Noble and approved Noble's suspension without pay was a stray remark by a non-decisionmaker unrelated to the applicable decision making process. *See Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998). Even considering Sheahan's alleged statement in conjunction with Noble's other evidence of pretext, as Noble correctly urges this Court to do, we conclude that this evidence is not relevant to our analysis. *See Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1406 (7th Cir. 1996).

There is also sufficient evidence to support the inference that Defendants knew Miceli provided false information and that Swaine did not genuinely believe the proffered reasons for his termination recommendation. Swaine testified that, during the course of his investigations of Noble, many people told him that Miceli was untrustworthy. (R. 37-2, Pl's. Statement of Facts ¶ 45 (citing Swaine Dep. Ex. 10).) Swaine himself described Miceli as a "nefarious gentleman."[7] (*Id.* at ¶ 50.) Swaine was fully advised of Miceli's criminal background.[8] (*Id.* at ¶¶ 42-43.) Swaine knew that Miceli initially had approached the Sheriff's Department with the promise that he could "set up" Noble and help Defendants dismiss Noble's lawsuit in exchange for protection. (*Id.* at ¶ 34.) Swaine was also aware that Miceli was particularly hostile toward Noble because of Noble's relationship with Miceli's ex-wife. (*Id.* at ¶ 51.) Against this weight of evidence, Defendants argue that, because Swaine was "very cognizant of Miceli's shortcomings as a witness," he took steps to corroborate Miceli's complaints against Noble by obtaining independent, documentary evidence.[9] (R. 43, Defs.' Reply at 14.) We are not convinced by

---

[7] Swaine acknowledged that he believes Miceli lied to him about various matters, including the allegation that Noble intended to harm Miceli and that Miceli had cancer. (R. 37-2, Pl's. Statement of Facts ¶¶ 38, 40 (citing Swaine Dep. Ex. 10).) Furthermore, Swaine did not investigate Miceli's allegations that Noble had beaten him up in Cook County Jail in late 1998 because he believed Miceli sounded irrational. (*Id.* at ¶ 55.)

[8] Detective Lambert kept Swaine informed about the ongoing criminal investigation of Miceli. (*Id.* at ¶¶ 29, 46.) As such, Swaine knew that Miceli had a motive to fabricate allegations against Noble because of the imminent threat of criminal prosecution. In addition, we note that Lambert testified he never had any reason to believe that Noble engaged in illegal conduct and that Noble "absolutely" cooperated with him in his investigation of Miceli. (*Id.* at ¶ 68.)

[9] The steps Swaine took in conducting his investigation included: (1) submitting the documents Miceli claimed Noble wrote to a handwriting analyst; (2) obtaining travel documents in an effort to confirm that Miceli and Noble had traveled together and that Noble carried his firearm; and (3) interviewing Noble, Lambert, Cruz and Brown. (R.43, Defs.' Reply at 15.)

Defendants' statement that they "did more than merely rely on the word of a 'nefarious' character." (R. 43, Defs.' Reply at 15.) Noting again that issues of credibility and intent are especially crucial in employment discrimination cases, and viewing the evidence in the light most favorable to Noble, we find that there remains a genuine issue of fact as to whether Defendants' proffered reason for suspending Noble without pay pending Merit Board action is pretextual. *See Courtney*, 42 F.3d at 418.

Although Noble has sufficiently called into question the genuineness of Defendants' reason for suspending him, he still carries the ultimate burden of persuading the fact-finder that Defendants discriminated against him on the basis of race. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). This can be determined only by a trial on the merits. As such, we leave this issue for the jury and deny Defendants' motion for summary judgment on this claim.

## C. Retaliation – Prima Facie

In order to establish a prima facie case of retaliation under Title VII,[10] Noble must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse action by his employer; and (3) there is a causal link between the protected expression and the adverse action. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). If Noble can make a prima facie case, the burden of production shifts to Defendants who must come forward with a legitimate non-retaliatory reason for their actions. *See Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999).

---

[10] The retaliation provision in Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he had made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a.)

If Defendants can produce such a reason, the burden shifts back to Noble to demonstrate that Defendants' proffered reasons for the adverse action were a pretext for retaliation. (*Id.*)

Defendants claim that Noble cannot establish a prima facie case of retaliation because there is no causal link between Noble's protected expression and any adverse employment action taken by Defendants. To establish this causal link, Noble must demonstrate that Defendants would not have taken the adverse action "but for" the protected expression. *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 479 (7th Cir. 1995). Evidence that the adverse action was temporally close to the protected expression may forge the requisite connection. *Pierce v. Martin*, 1997 WL 802104, at *7 (N.D. Ill. Dec. 30, 1997); *see McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789 (7th Cir. 1997) (two-to-three day period between filing EEOC complaint and termination established causation); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989) (one week gap between the protected activity and the adverse action satisfied causation element). But as the temporal distance between the protected expression and the adverse action increases, courts are less willing to find a causal link absent additional evidence connecting the expression to the adverse action. *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996). *See Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (eight month interval too long); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (six months too long). In short, the adverse action must occur "on the heels" of the protected expression. *McClendon*, 108 F.3d 797. *See Hubbard v. Blue Cross Blue Shield Ass'n*, 1 F. Supp. 2d 867, 881-82 (N.D. Ill. April 9, 1998) (one week between complaint and warning is "telling temporal sequence" but three months between complaint and probationary program was not "on the heels" of protected expression).

Noble engaged in statutorily protected expression by filing and pursuing charges of race discrimination against Defendants with the IDHR. He first filed the charges in September 1995 and last amended them in May 1996. Between March 1998 and November 1998, the IDHR requested Defendants on three occasions to supplement their responses to Noble's charges. Therefore, the latest date that Noble actually "participated in any manner in [the IDHR] investigation" pursuant to Title VII's retaliation provision was November 1998.[11] The adverse employment action at issue -- the filing of a complaint against Noble and his suspension without pay pending Merit Board action -- did not occur until May 1999. This six month interval is clearly not a "telling temporal sequence" and does not, in itself, establish a causal link between Noble's participation in the IDHR investigation and Defendants' adverse employment action.

Moreover, lacking temporal proximity, Noble does not point this Court to additional evidence that would give rise to an inference of retaliation by establishing a "but for" causal link between his protected activity and Defendants' adverse action. *See Adusumilli*, 164 F.3d at 363. Indeed, Undersheriff Robinson, who signed and approved Defendants' action, testified that, prior to August 2000, he did not know that Noble had litigation pending against Defendants and he did not know that Noble had filed charges of discrimination with the IDHR.[12] As there is not

---

[11] That the IDHR completed its investigation in July 1999 has no relevance because Noble's statutorily protected expression includes only his assistance or participation in the investigation, the latest of which occurred during the IDHR fact-finding conferences from March to November 1998. Moreover, that Noble did not discover he was suspended until he returned to work on August 11, 1999 has no relevance. The adverse action occurred on May 3, 1999 -- two months prior to the issuance of the IDHR report -- when Robinson signed the Merit Board complaint and approved Noble's suspension without pay. (R. 31, Defs.' Statement of Facts ¶¶ 11-13.)

[12] Noble does not rebut this testimony, but points to an affidavit executed by Robinson recounting his involvement in Noble's August 1995 fourth-step grievance hearing as evidence

sufficient evidence to establish that Robinson knew Noble engaged in any protected activity, he could not have taken the adverse action against Noble "but for" that protected activity. Therefore, because Noble cannot establish a prima facie case of retaliation, we grant Defendant's motion for summary judgment with respect to this claim.

## CONCLUSION

In sum, Noble has failed to set forth facts from which a reasonable jury could find direct evidence of discrimination or retaliation by Defendants Sheahan and the Cook County Sheriff's Department. Noble also has failed to raise a genuine issue for trial with respect to his claim of prima facie evidence of retaliation. We therefore grant Defendants' motion for summary judgment on these claims. Noble, however, has raised genuine issues of material fact on a prima facie case of discrimination and whether Defendants' proffered explanation for Noble's suspension is a pretext for race discrimination.

Therefore, Defendants' motion for summary judgment is granted in part and denied in part. (R. 30-1.) To the extent noted herein, we have denied Plaintiff's motion to strike where relevant. (R. 37-1.) The parties are ordered to attend a status hearing at 9:30 a.m. on March 6, 2001, to set a fair and efficient schedule for trial on Noble's remaining Title VII claims. To the extent determined herein, all undisputed facts set forth in this opinion shall be deemed established, pursuant to Fed. R. Civ. P. 56(d), for the trial of this lawsuit.

---

that Robinson knew that Noble engaged in protected activity by filing charges with the IDHR. (R. 37-2, Pl.'s Statement of Facts ¶ 14.) However, as Defendants correctly point out, there is no evidence that Robinson knew the affidavit was related to an IDHR investigation as the affidavit makes no reference to the IDHR or to charges of discrimination filed by Noble. (R. 46, Defs.' Resp. to Pl.'s Statement of Facts ¶ 14.)

Entered:

Judge Ruben Castillo
United States District Court

Dated: February 9, 2001